# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| RICO MITCHELL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 24-00304-KD-B** |
| | ) | |
| **PERDIDO TRUCKING, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This action is before the Court on the Motion for Summary Judgment filed by Plaintiff Rico Mitchell (doc. 112), Defendant Perdido Trucking, LLC's response (doc. 123), Mitchell's reply (doc. 132); and Perdido's Motion for Summary Judgment (doc. 120), Mitchell's response and request for sanctions[1] (doc. 124), and Perdido's reply and motion to strike (doc. 131).

I. <u>Procedural Background</u>

Mitchell, a resident of Mississippi, was employed with Perdido as a truck driver. He was terminated on May 13, 2023. He filed a charge of Discrimination with the Equal Employment Opportunity Commission on June 15, 2023 (doc. 1-1, p. 4-5), as follows:

> In or around May 2022, I was hired as a Driver. I was discriminated against because of my race. I am Black.
>
> In or around November 2022, I was subjected to offensive comments by a shop foreman. In or around January 2023 I reported my truck was being tampered with by a mechanic. I was discharged for insubordination on or about May 10, 2023.
>
> I was discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended

---

[1] Mitchell included a summary request for sanctions (doc. 132). However, review of the document indicates that he did not allege any viable basis for sanctions. Thus, his request is denied.

(doc. 1-1, p. 4).

On June 21, 2023, the EEOC issued a Notice of Right to Sue letter (doc. 1-1, p. 1-3). The EEOC decided not to proceed further with its investigation and made "no determination about whether further investigation would establish violation of the statute." (Id.)  Mitchell was instructed that any lawsuit must be filed within 90 days of his receipt of the notice. (Id.)

On August 30, 2023, Mitchell, proceeding *pro se*, filed a Complaint against Perdido alleging federal question jurisdiction under Title VII of the Civil Rights Act and 49 U.S.C. § 31105 (doc. 1). He filed his Complaint in the Southern District of Mississippi.

Perdido, whose principal place of business is in Mobile, Alabama, moved to transfer.  The motion was granted, and the action was transferred to this Court on August 26, 2024.  That same day, Perdido filed its answer (doc. 17).

Mitchell amended his Complaint to specifically state that "49 U.S.C. § 31105 + The Surface Transportation Assistance Act of 1982 (STAA)",[2]  was a basis for federal question jurisdiction as well as Title VII (doc. 31, p. 3).  In the Amended Complaint, Mitchell alleges:

> The employer began to discriminate against Mitchell after a meeting on September 29, 2022. The workplace became hostile and unsafe. The employer eventually terminated Mitchell for reporting a safety issue on May 13, 2023.

(Doc. 31, p. 4).

This Court has original jurisdiction to consider an STAA claim after a complaint is filed with the Department of Labor, but only "if the Secretary of Labor has not issued a final decision

---

[2] Title 49 U.S.C. § 31105 is part of the Surface Transportation Assistance Act of 1982 (STAA) and "prohibits an employer from 'discharg[ing,] ... disciplin[ing,] or discriminat[ing] against an employee regarding pay, terms, or privileges of employment' because the employee 'has filed a complaint ... related to a violation of a commercial motor vehicle safety or security regulation, standard, or order.' 49 U.S.C. § 31105(a)(1)(A)(i)."  Fort v. U.S. Department of Labor, No. 20-

within 210 days after the filing of the complaint...." 49 U.S.C. § 31105(c). Perdido asserts, and Mitchell has not disputed, that he filed a claim with the DOL sometime before August 30, 2023. (Doc. 39 at p. 1). And that when he amended his complaint in November 2024, to include the STAA claim, that his DOL claim was still pending. (Id. at 2).

II. Factual background

Mitchell, who identifies himself as Black, applied for a truck driver position with Perdido on April 29, 2022. He was hired and began work on May 10, 2022.

Perdido specializes in hauling aggregate and construction materials and maintains a fleet of trucks for that purpose. Perdido's Employee Handbook contains an anti-discrimination and harassment policy. The policy prohibits workplace conduct that is harassing or disrespectful towards co-workers or supervisors, as well as making false statements or false omissions to Perdido.

Perdido also has safety policies which require its drivers to report any problems or defects with the trucks or trailers to their Driver Manager and/or to the Safety Manager, Gary Smith. Perdido trucks are inspected for safety and compliance with all Department of Transportation ("DOT") and Federal Motor Carrier Safety Act ("FMCSA") rules and/or regulations before they are given to drivers.

Mitchell acknowledged receipt of a copy of the Perdido Trucking Driver Manual, the Employee Handbook, and a job description, and understanding of same. Perdido's Vehicle Use Policy provides that a driver's failure to comply with all Federal Motor Carrier Safety Act regulations is a violation of company policy. Perdido's policy provides that a violation of its

---

13998, 2023 WL 155210, at *3 (11th Cir. Jan. 11, 2023), cert. denied sub nom. Fort v. Dep't of Lab., 144 S. Ct. 140, 217 L. Ed. 2d 47 (2023).

Vehicle Use Policy or any FMCSA rules or regulations including the use of a cellphone[3] while driving or the operation of a vehicle with a defect that would prevent safe operation, subjects an employee to discipline including termination.[4] Perdido requires its drivers to report issues with the trucks or trailers, including but not limited to safety issues, on Driver Vehicle Inspection Reports (DVIRs).  The drivers email their DVIRs which are circulated among Perdido employees, who then take the requisite action on the reported issues.

Mitchell was trained on the Driver Manual, proper pre-trip and post trip inspections, proper completion of DVIRs, and Perdido's policies regarding dispatch. He was also trained on Perdido's policy that drivers are required to notify their Driver Manager if dispatched trips cannot be completed by the driver.

Pursuant to the Driver Manual, Mitchell was required to "maintain truck and driving logs according to DOT regulations" and "conduct and document daily vehicle inspections." (doc. 119-5). As with all drivers, Mitchell was responsible for completing and conducting pre-trip and post-trip inspections and for maintaining current DVIRs on his truck. Mitchell was required to complete and submit a DVIR any time a safety issue needed to be reported to Perdido.

Perdido does not repair its trucks. Instead, when a driver reports an issue, verbally or in a DVIR, it sends the trucks for repair at independently owned mechanic shops including Bayou Concrete Theodore, Bayou Concrete Gulfport, Truckworx (the repair department at Kenworth of Mobile), and Gulf Coast Truck and Equipment Company, Inc., sometimes referred to as Gulf Coast Mack or CGM.  Perdido does not employ, control, or supervise the mechanics at these shops.

---

[3] Mitchell has produced a copy of a photo he took with his cell phone while operating a truck and experiencing a safety issue (doc. 76, p. 18). Perdido asserts that this is a violation of company policy and had it known, would have resulted in termination. (See also photo at doc. 119-19, p. 4).

Mitchell's Driver Manager was Pat Driver. During Mitchell's one year of employment, he was assigned 5 trucks. Mitchell was first assigned to Truck 416. In June 2022, he reported several issues including issues with the transmission, steering, and ABS light (doc. 119-7). On July 26, 2022, Mitchell reported a steering issue and told his Pat Driver that he did not feel safe driving the truck (doc. 112). Perdido sent Truck 416 to an independent mechanic for inspection, but the steering issue Mitchell alleged could not be replicated (doc. 119-7). On July 29, 2022, Mitchell texted Pat Driver that he did not "feel safe in truck 416" and was coming to speak with him (doc. 112, p. 13).

Around August 17, 2022, Mitchell was assigned Truck 385. He reported several issues - headlight cover knocking, vibrations and noise in steering, a fuel cap, check engine light- all of which were addressed and repaired (doc. 119-7). However, repair of the last issue - check engine light - which was reported on September 23, 2022, was delayed due to supply chain issues affecting the ability to obtain parts.

In his Amended Complaint, Mitchell alleges that Perdido "began to discriminate against Mitchell after a meeting on September 29, 2022" (doc. 31). On that date, Mitchell texted Pat Driver, that he was "trying to speak with Kathy involving truck 385 safety issues, before continuing to drive." (doc. 112, p. 13). Mitchell came to Perdido's Mobile, Alabama office and met with Kathy Lyles, Executive Administrator/Human Resources, and Charles Bishop, Logistics Manager about the delay in repairs (doc. 119-4, p. 4-5, Lyles Declaration). Lyles explained that "the delay was due to a national backorder and supply chain issue with the part needed for the repair" and that other trucks were also down, not just Mitchell's (Id.). Mitchell was skeptical about the repairs made to Perdido's trucks but admitted he lacked mechanical knowledge. Bishop reassured Mitchell that the mechanics were acting properly and explained the steps Perdido takes to ensure the safety of its

---

[4] Perdido requires its employees to report safety issues and has terminated employees for violation

trucks including Perdido's ability to monitor fault codes and DVIRs to determine whether safety-sensitive or non-safety-related matters are reported (doc. 119-8).[5] "Bishop explained the importance of DVIRs and told Mitchell to always put 'anything that's wrong' on his DVIR because that report automatically goes to a number of people in management." (Id.). Lyles and Bishop "emphasized to Mitchell that Perdido Trucking will never leave one of its drivers in an unsafe truck." (Id.).

On September 30, 2022, Mitchell was assigned Truck 388. He soon reported a "regen" issue, the ABS light was on, and the truck was shifting hard (doc. 119-7). Pat Driver sent Mitchell to Theodore for repairs. (Id.). The mechanic rode with Mitchell to attempt to diagnose the issues, but could not duplicate them, except the ABS light (doc.119-4). The mechanic reported that during the test drive, Mitchell "let off the gas when truck was shifting and that is what was causing the hard shifting issue" (Id.). Driver sent Mitchell and Truck 388 to Kenworth for a "forced regen and to monitor the truck during the regen" (Id.). The ABS issue was resolved.

On October 5, 2022, Mitchell began driving Truck 389. Mitchell claims that Truck 389 released "large amounts of smoke," and had leaks (doc. 112-1) but he did not report these issues in his DVIRs.

On October 11, 2022, a customer reported that Mitchell was not wearing a hard-hat, *i.e.* PPE equipment (doc. 119-9, p. 8-9 ("Rico no hard hat and not dropping tickets and 447 no vest). Driver counseled Mitchell about this safety violation (doc. 119-9, p. 3).

On October 20, 2022, Mitchell first reported an issue with Truck 389. Specifically, that there was an "odd smell" when the AC and/or heat was on (doc. 119-7). Truck 389 was sent to Kenworth

---

of its Policy (doc. 119-4; doc. 119-20).

[5] Mitchell recorded his meeting with Lyles and Bishop. He gave a copy to Perdido, and Perdido provided the Court with a transcript of the conversation.

for service. Upon inspection, the mechanics found no signs of leaks and could not duplicate Mitchell's complaints. (Id.).

On November 2, 2022, Mitchell was disciplined because he did not complete his dispatched loads and left work early without notifying Pat Driver (doc. 119-2, p. 8, Personnel File; doc. 119-9, Driver Declaration, doc. 119-11, Amy Charest[6] Declaration). Pat Driver counseled Mitchell to contact him if he could not dispatch the loads and that "explained to Rico he couldn't just leave work and not talk to anyone" (doc. 119-9, p. 3, doc. 119-2, p. 9).  Mitchell claims that he did not receive a disciplinary warning, but admits he was counseled about dropping loads and failing to contact Pat Driver if he was not going to complete his dispatch (doc. 119-3, p. 9-10, Mitchell Deposition).

On November 3, 2022, Mitchell reported an issue with his turn signal and a bad smell in the AC.  He took Truck 389 to Theodore where the mechanics repaired the lightbulb in the left front turn signal and replaced the AC filter. The mechanics also checked the exhaust and front end and did not detect any issues with the exhaust (doc. 119-7).

On November 14, 2022, Mitchell reported an oil leak and Perdido sent Truck 389 for repairs at Truckworx at Kenworth (doc. 119-7).  Mitchell alleges that while waiting for repairs, on or about November 17, 2022, Pat Driver asked him to ride with Equipment Manager Ray Spencer to pick up a truck (doc. 112-1, p. 2). Mitchell states that "[a]s we were riding, Ray ensures me that he has his gun that the guy we're picking up the truck from might act crazy, shortly after he states, 'I hate when black folks call each other the N word.' I just look at him as he then states, 'Do you know why black folks call white folks cracker, cause the sound the whip made' again me no response."

---

[6]  Amy Charest is an Administrative Assistant who monitors attendance.

(*sic*) (Id.)[7]   Mitchell also states that since his truck was not repaired, he took the company pickup truck home.

The next day, November 18, 2022, Mitchell returned to the shop at Theodore, where Ray Spencer has an office, and tried to communicate to Spencer that the pickup truck needed fuel, but he ignored Mitchell (Id.).  Mitchell then drove the pickup to Kenworth to retrieve his fuel card. At some point,

> Pat then calls me to take some materials from Theodore, Al to Gulfport Ms. Ray began to call upset about the pickup, upon my return he decided he wanted me to stay at Theodore then locked the break room and refused to take me back to Kenworth or to my car. I had no other choice but to walk. I called Pat to inform him as he laughed again until being told forcefully by Charles, 'Pat, he's walking home.' Pat picked me up and took me to my truck at Kenworth.  It was ready the whole time as I tried to explain to Pat about Ray, he began to yell 'The government is a scam' and shook his truck back and forth, I just stopped talking.

(Doc. 112, p. 2).

Perdido's Safety Manager, Gary Smith, states that:

> In the Fall of 2022, it was reported to me that Ray Spencer, Perdido Trucking's Equipment Manager, had allegedly made some inappropriate comments to Mitchell. Spencer denied the comments, but I nonetheless counseled him and instructed him to not interact with Mitchell anymore. I did not share information about this incident with any Perdido Trucking driver or any third-party mechanics.

---

[7] Mitchell also states that he "spent a lot of time at the repair shop in Theodore waiting for different trucks" and "during the wait Ray Spencer would impose unprovoked conversations things such as 1. We could kidnap the president, and the secret service would just stand there. 2. He could say stuff I couldn't, because he was white. 3. He could teach black folks how to hide their money, we need jobs. 4. He was a member of the Mongols biker gang. 5. When opinion different from his, sometimes no opinion at all I got my gun right here. 6. 1 can walk into a courtroom and check the judge, and nothing will happen. 7. All their members are ex-military." (doc. 112-1, p. 1).  In support, Mitchell provides screen shots which appear to be from Spencer's social media posts (doc. 124-7).  Spencer denies making these statements (doc. 119-10).  Spencer reports that he is not White, but Hispanic (Id.).

(Doc. 119-1, p. 5).  Smith also states that he took "additional steps to ensure Mitchell and Spencer would not be required to interact with each other" and "began to route Mitchell to shops other than the Bayou-Theodore shop and encouraged Mitchell to contact" him or Pat Driver "regarding maintenance issues going forward" (Id.).[8]  Smith states that Spencer has an office at the Theodore shop but often travels between other mechanic shops, and that "Spencer was never intentionally sent to the same place as Mitchell." (Id.).  Spencer and Mitchell never spoke to each other after this incident.

On December 6 and 8, 2022, Mitchell reported issues regarding Truck 389's transmission. Specifically, "fault code wouldn't shift" 2023 (doc. 119-6, p. 2, summary of DVIRs). Truck 389 was sent to Theodore, then to Kenworth, and then to another shop for a clutch replacement (Id.).

On December 9, 2022, Mitchell began driving Truck 446, a newer truck in Perdido's fleet (doc. 119-1, ¶ 20). On January 5, 2023, he reported an issue with a "hub oil seal on driver side trailer" for Trailer 139 (doc. 119-6).  The seal was repaired at Theodore (Id.).  On January 16, 2023, Mitchell reported a "smoke and burning smell" (doc. 119-7, p. 59). The Repair Order from Gulfport indicates the mechanic found "no coolant leak on engine" or in the "coolant system" but the "coolant reservoir was over full" and "coolant came out overflow cup" (Id., p. 60).  On January 19, 2023, Mitchell verbally reported to Pat Driver, that the engine ran hot while sitting still. Perdido sent the truck to Gulf Coast Truck for this issue, and for service and an annual DOT inspection (doc. 119-7, at 61-65). The mechanic noted "Customer request to check engine" and reported "No

---

[8] Mitchell perceives this as "isolating him from various locations" (doc. 119-20, p. 15).
In a text message to Hollister, Mitchell wrote that Smith and Lyles "believe they have made accommodations to rectify the situation [with Spencer] by isolating me from various locations and for the past couple of weeks I've been running solo routes. Management believes coddling a racist and isolating me, making everything difficult for myself and them is a solution" (Id.).

problem found at this time. Ran truck to temp. Let idle till shut off. Did not overheat at this time."

(Id. at p. 62). Mitchell resumed driving Truck 446 on January 26, 2023.

On February 13, 2023, Mitchell came to the office and met with Smith and Lyles. He was still concerned about the incident with Spencer on November 17, 2022, and spoke about it again (doc. 112-1, p. 3).  Smith reminded Mitchell that that situation had been addressed and asked Mitchell if anything else had happened (doc. 119-14, transcript of meeting).[9]  Mitchell then told Lyles and Smith that he believed a mechanic at Theodore, where Spencer has an office, had changed the parameters[10] on Truck 446 to make it run slower, take off slower from intersections, and was slower on hills (Id.).[11]  Mitchell stated that the "truck was running fine" until he "had it service at Theodore Bayou" (*sic*) (doc. 112-1, p. 3).  He "couldn't pinpoint the problem" and "took it to the mechanic at Gulfport Bayou during a slow day" (Id.) Mitchell alleged that the unnamed mechanic told Mitchell that Truck 446 had been "turned down" (Id.).  Mitchell surmised that the "truck issue" was the result of his November 2022 complaint to Pat Driver about Ray Spencer's alleged racist statements (doc. 119-14; doc. 112-1, p. 3).

Regarding the February 13 meeting, Mitchell states that "Kathy seemed confused about the racial component, but Gary was upset and stated we're not going to put up with that stuff" (doc.

---

[9] Mitchell recorded the February 13, 2023, conversation.  He gave a copy of the recording to Perdido and the Court.  Perdido transcribed the recording and cites to the transcript.

[10] Smith explains that the "parameters on a truck are a set of various settings related to speed, fuel efficiency, acceleration, engine performance, engine idle speed and the like. The parameters on a truck can be set to ensure safety, compliance with speed limits, and to promote fuel efficiency." (doc. 119-1, p. 6).  He also explains that the "parameters on Perdido Trucking's trucks, including those driven by Mitchell, are consistent with federal requirements, including those under the FMCSA, and industry standards." (Id.).

[11] Even with this complaint, Mitchell certified that Truck 446 had no defects, and continued to drive (doc. 119-7, p. 129).

112-1, p. 3). According to the transcript of the meeting, Mitchell expressed his belief that mechanics at Theodore treated him disrespectfully because Spencer had told them about Mitchell's complaints to management about Spencer. Smith responded that Mitchell should take his trucks to Gulfport when possible, but if he needed to go to Theodore, Smith would meet him there (doc. 119-14).

Mitchell also argues that Lyles and Smith "understood what [he] was saying", i.e., understood that Truck 446 had been "turned down" for racial reasons, because "they offered alternatives to the reasons for the malfunctions with the truck" and the "following day, they sent [him] to Kenworth to have the parameters changed." (doc. 112-1, p. 3).[12] However, the transcript indicates that Lyles and Smith explained to Mitchell that the mechanics at Theodore and Gulfport did not have the ability to "change" the parameters and that only Kenworth could do so (doc. 119-14; doc. 119-1, doc. 119-4). As a result, Smith did not send Truck 446 to Truckworx at Kenworth to have the "parameters changed" (doc. 119-1). Instead, the next day, February 14, 2023, Smith sent Truck 446 to have the parameters checked (doc. 119-7, p. 110, "Check para."). Kenworth confirmed that the parameters had not been changed (Id.).[13] Also, the engine idle speed was

---

[12] Mitchell also believes that after his complaint about Ray Spencer, "Ray spoke with Kenworth" and his visits to Kenworth "was different from before" (doc. 112-1, p. 3-4) (Id., p. 9, photo taken by Mitchell allegedly showing Spencer at Kenworth). Mitchell states that he "no longer dealt with the mechanics" and "only dealt with management", the "mechanics were instructed not to work" on his trucks "without management's approval", and the mechanics were "disrespectful and refused to work on trucks until forced by their management" (doc. 112-1, p. 3). He also states that on October 4, 2022, someone rigged a fuel pump to spray him in the face and that Pat Driver laughed at him when he told Driver what happened (doc. 112-1, p. 2) (the record is not clear as to whether the fuel pump issue occurred in Theodore or Pascagoula). He also states that in April 2023, "someone began to lock" him out of parking at Pascagoula, and that "certain drivers began to pull out in front of [him] forcing [him] to back up on narrow roads, also 'mean mugging' in the process" (doc. 112-1, p. 3-4).

[13] Mitchell recorded a conversation with an unidentified mechanic at Truckworx/Kenworth. He gave a copy of the recording to Perdido and Perdido had the recording transcribed (doc. 119-16). In the conversation, Mitchell questions the Kenworth mechanic as to whether the parameters had been changed and tells him that Truck 446 ran better after a mechanic at Gulfport "hooked it up with the

increased from 650 rpm to 700 rpm, which is a "minor" and "ordinary adjustment to the idle speed when the truck is stationary" which "does not affect the performance of the truck" (doc. 119-20, p. 5, p. 27).[14]

> At Kenworth, the mechanic wrote:
>
> Used Paccar PVP to download parameters and look at the parameter history.  Sent parameter sheet to customer and let them know the parameters have not been changed since the original settings were made when the truck was prepped for Perdido.
>
> Customer wanted to change the engine idle from 650 to 700. Changed the engine idle speed to 700 and checked the hill assist setting. The hill assist setting is the same as other unit. Downloaded and sent the parameters changed to the engine.  Test drove the unit to check for any performance issues or difference from other unit. Truck ran good like other Perdido units.

(Doc. 119-7, p. 110) (*sic*).

> Paul Beeson, the Maintenance Director at Bayou Concrete, states that the mechanics at Bayou Concrete's Theodore and Gulfport shops "do not possess the software and/or licensing necessary to make changes to the software on Perdido's Kenworth Trucks and/or Paccar engines" and "cannot make adjustments to the parameters, including, but not limited to, the engine, cab, or chassis parameters on Perdido's trucks" (doc. 119-18).[15]

---

computer, it was driving a little bit faster …I don't know what he did."  The mechanic answers: "I didn't see anything in there out of the normal"; "yeah, there hasn't been nobody that changed anything in the last six months"; and "from what i can see ain't nobody hooked up to it", which appears to mean connecting the truck to the proprietary software program which could change the parameters.

[14] Only Kenworth had the proprietary software to change the parameters that Mitchell believes were changed (doc. 119-20).

[15] Perdido provides a Chassis Parameter History for Truck 446 generated by Kenworth. The History confirms that, during the relevant time, the only modification to the parameters for Truck 446 occurred on February 14, 2023, when the engine idle speed was increased from 650 to 700 rpms

Also, on February 13, 2023, Mitchell was counseled by Smith about Mitchell's unsafe rolling stops at intersections, which were recorded on Perdido's DriveCam system. (Doc. 119-14). Previously on February 9, 2023, Jennifer Huebner, DriveCam Manager, coached Mitchell about two DriveCam violations for his failure to make a complete stop on January 31 (Doc. 119-15; Doc. 119-13, ¶¶ 4-5). Mitchell requested to view the videos in person and he and Smith reviewed the videos. (Id.).

On February 21, 2023, Mitchell reported "check engine light". The issue was repaired at Gulfport (doc. 119-6).

On March 8, 2023, Mitchell reported "coolant light, truck lags during takeoff" (doc. 119-7, p. 68; doc. 119-6). This was the last report to Perdido that Truck 446 was sluggish. Perdido had the mechanics at Gulf Coast Truck inspect Truck 446. The mechanics test drove the truck but could not duplicate Mitchell's complaint and confirmed there were no power issues with the truck (doc. 119-7, p. 68-70). The next day, Pat Driver and Lyles called Mitchell, and he reported the truck was "pulling fine" (doc.119-4, ¶ 19). On March 10, 2023, Driver called Mitchell again and he reported that the "truck is pulling fine even under a load" (Id.).

Mitchell states that the "truck ran okay for about a month until shutting down …" (doc. 112-1, p. 3). On March 13, 2023, Mitchell reported "coolant light also shut down warning" on his DVIRs (doc. 119-7, p. 71). Truck 446 was repaired by Gulf Coast Truck and driven back to the shop (doc. 119-7, p. 72, invoice for road call). Thus, Mitchell appears to mean Truck 446 "ran

---

(doc. 119-17). The parameters had been modified on May 17, 2022, but that was before Mitchell began driving the truck in December 2022 (Id.).

okay" from February 14, 2023, until March 13, 2023.  He resumed driving Truck 446 on March 22, 2023.[16]

On March 30, 2023, Mitchell reported "Drive axle sensor rear".  The rear differential temperature sensor was removed and replaced at Kenworth (doc. 119-7, p. 81).  On April 28, 2023, he reported "AC".  The air conditioning system was repaired on May 1, 2023, at Gulfport (doc. 119-7, p. 103; doc. 119-6).[17]

On May 9, 2023, Charest informed Pat Driver that Mitchell had not completed all loads that day (doc. 119-9, p. 3, 5). Pat Driver contacted Mitchell and verbally counseled him again about failing to notify Driver if he could not complete his hauls.  Pat Driver dispatched Mitchell to haul the next day (Id., p. 5).  Mitchell did not report any safety issues with Truck 446 to Pat Driver and certified on his post-trip DVIR that there were no safety defects (doc. 119-7, p. 138, Form Message Report) (These forms indicate that the last "defect found" by Mitchell was on April 28, 2023 when Mitchell reported problems with the air conditioning).

Mitchell did not haul the loads on May 10, 2023. He states that after he had been "in and out the shop from mid-March until the end of April dealing with mechanical issues", he told Pat Driver that he "was coming to speak with management on May 10, 2023" (doc. 112-1, p. 3; doc. 119-19, text message at 5:38 a.m.).  He did not inform Pat Driver that he was not going to drive or that there were safety issues with Truck 446 (doc. 119-19).

---

[16] On March 16, 2023, Pat Driver assigned Truck 391 to Mitchell while Truck 446 was repaired. Mitchell declined to drive Truck 391 because it was cluttered. He sent Driver several photos of the interior of the truck (doc. 131-1, p. 2-4).

[17]  During March and April 2023, Mitchell entered eight DVIRs about the "ABS" on Trailer 138. In each instance, the issue was addressed (doc. 119-7, p. 76). He appears to have begun pulling Trailer 143 on April 18, 2023 (doc. 119-7, p. 134, Form Message Report).

At around noon on May 10, 2023, Mitchell met with Lyles and Smith and told them he wanted to speak with Perdido's owner, "Mr. Hollister, whom [he] had been trying to reach since mid-April" (doc. 112-1, p. 4).[18]  Lyles and Smith thought Mitchell wanted to discuss the reprimand of May 9, 2023 (doc. 119-4).  Mitchell then explained "what was wrong with the truck" – reiterating his speculation that the parameters had been altered – and Smith told him "to bring it in" (doc. 112-1, p. 4) even though he had been repeatedly told that changes to the parameters by the mechanics was not possible (doc. 119-14, doc. 119-1).

Mitchell stated that the truck had been sluggish for the past month, but he was just living with it and had not reported the issue (doc. 119-4). Mitchell did not state that Truck 446 was unsafe (doc. 119-1, p. 8). Mitchell then began to "explain the new racial components that were transpiring and having me being isolated from shops and routes" but "Gary began to yell we already addressed this, so I took their interruptions as they were not interested" (Id.).  Mitchell felt that the "meeting ended on a bad note" (Id.).[19]

Mitchell testified that he could not recall what he told Smith or Lyles or if he told them the truck was not safe to drive (doc. 119-3, p. 51).  But he speculated that they understood that he was reporting a safety issue (Id., p. 52).  However, Smith did not understand Mitchell's comments regarding the truck during the meeting to be related to an issue of safety under the federal motor safety standards (doc. 119-1, p. 8).  Mitchell did not report to Pat Driver that he was not going to

---

[18] In one of his text messages to Pat Driver, Mitchell writes that he "sent a letter requesting to speak with the owner" (doc. 119-19, p. 11).

[19] That afternoon, Mitchell called Huston L. Hollister (Hootie), the Technology Administrator, and said he was unsure about his employment status, and asked what to do with the company-issued tablet.  Hootie called Smith who verified that Mitchell was still employed, and Hootie told Mitchell that he was still employed (doc. 119-4).

work. He did not request a different truck to make his load.  He did not tell Lyles and Smith that he was not going to drive (Id.).

At 4:40 p.m. on May 10, 2023, Mitchell sent an email to Joey Mura, Compliance Administrator, in an attempt to reach Perdido's President R. Huston Hollister. He attached what appears to be a text message addressed to Hollister (doc. 119-20, p. 12-15).

At 6:11 p.m. on May 10, 2023, Pat Driver dispatched Mitchell for work on May 11, 2023 (doc. 119-19, p. 10).  Mitchell did not show up for work. He did not tell Driver that he was not going to work and did not report any safety issues with Truck 446 (doc. 119-1, doc. 119-9).

At 7:14 p.m., on May 10, 2023, Smith texts either Lyles or Driver, or both, that "The more I think about it, the more I think we need to try and get Rico in another truck.  Not sure which truck we can put him in, but we need to start looking for one."  (doc. 124-10, p. 1-2). At 8:29 p.m., Driver responds: "1/2 the drivers in MS want other trucks because they break down, that will cause a lot of issues." (Id.)  Smith immediately responds, "I get that …. Just don't know what else to do." (Id.).

At 9:08 p.m., on May 10, 2023, Mitchell texted Pat Driver:

> What's going on, Pat?  I sent a letter requesting to speak with the owner. Things are kinda weird right now with you guys.  I'd like to speak with him to see what's going on?  Kathy mentioned trucks and preventing them from damage. [20]  I don't know what she's been told, but something is off. Gary also said you told him the issue was about the two loads,[21] I never said that, I'm hoping to meet with him asap tomorrow if possible.

---

[20] Mitchell appears to reference his meeting earlier that day with Lyles and Smith.  Lyles states that she reassured Mitchell that Perdido had already addressed his complaint about the parameters "because we did not want anything to happen to him or to cause damage to the truck" (doc. 119-4, p. 7).  Lyles appears to mean the February 14, 2023 inspection of Truck 446 performed at Kenworth and the inspection by Gulf Coast Trucks that was made after Mitchell's March 8, 2023, report of "coolant light, truck lags during takeoff".  The latter again confirmed no power issues with Truck 446 (doc. 119-6).

[21] On May 9, 2023, Charest informed Driver that Mitchell had not hauled his loads.

(Doc. 119-19, p. 6, 11) (*sic*).

At 2:13 p.m. on May 11, 2023, Pat Driver texts to Smith and Lyles that he just saw the message from Mitchell (doc. 124-10).  At 2:15 p.m., Smith responds, "I don't know what he is talking about" (Id.).

At 5:36 p.m. on May 11, 2023, Pat Driver dispatched Mitchell for work on May 12, 2023 (doc. 119-19, p. 6).  At 5:45 p.m., Mitchell responded by text message, "I'm shutting 446 down for safety reasons and requesting to speak to the owner. Thank you" (Id.).

Pat Driver notified Smith regarding Mitchell's shutdown of Truck 446.  At 7:50 pm, Smith texted Mitchell: "I heard you were dispatched and you will not work due to a safety issue? This is the first I heard of this." (doc. 119-19, p. 7).  Mitchell responds: "I've spoken with you about the issues. I've sent a letter explaining and requesting to speak with the owner to rectify the situation." (Id.).

Smith responds: "You need to tell me exactly what's unsafe about the truck." (Id.)

Mitchell responds as follows:

Gary, I will not continue to repeat myself for you, Sir.  I asked to speak to someone over you as you seem to not understand what I'm saying. You've been told the same problem exists from before. The truck lacks power to pull and stalls. Kathy, previous excuses were 1) you guys do this to save gas. 2) you guys do this to protect the truck from damage.  I've told you how the truck ran and when it was changed.  I took the problem to Bayou Gulfport and had it fixed, and Pat reversed the problem.  This is where we are now.  On top of you guys isolating me from various locations. I put all these things in the letter to the owner. I'm trying to find out what's going on as well as get repairs done.  Your hollering and tryin to brush things off only makes me feel more uncomfortable and insulted.

 (Doc. 119-19, p. 8-9) (*sic*).

On May 12, 2023, Mitchell did not log in or contact Perdido.  Driver and another Perdido employee retrieved Truck 446 in Pascagoula, Mississippi, and found that Mitchell had removed his

personal items and put the keys in the battery box. Truck 446 was driven from Pascagoula to Mobile, Alabama with no issues (doc. 119-9, p. 6). The mechanics at Kenworth made another Chassis Parameter History report which confirmed that the parameters had not been changed (doc. 119-17; doc. 119-20, Exhibit D). A second test drive on May 15, 2023, confirmed that Truck 446 had no issues (doc. 119, p. 6).

Also on May 12, 2023, Lyles and Smith briefed Hollister. At his request, Lyles created a timeline for his review. Hollister terminated Mitchell on May 13, 2023. He wrote to Mitchell:

> This letter confirms that your employment with Perdido Trucking Service is terminated. You refused to work on May 10, 11, and 12 despite being dispatched to do so. I have reviewed this matter including your communications with Gary Smith, which I find to be insubordinate, where you now attempt to excuse your refusal to work based on alleged safety reasons with your truck. However, the last time you drove the truck you certified in your post-trip inspection that there were not safety defects with the truck.

(Doc. 112, p. 15).

Hollister states that Mitchell's May 10, 2023, report of issues with Truck 446 and his co-workers was not the reason for his termination. (doc. 119-20, p. 2, Hollister Declaration). Instead, Hollister states he based his decision on Mitchell's failure to report to work after receiving the dispatches and without notifying Pat Driver that he "did not intend to work for a legitimate reason"; his "month-long failure to report an alleged safety issue - on his Driver Vehicle Inspection Reports (DVIR), his pre-trip or post-trip inspections, or to his Driver Manager Pat Driver" and his disrespect toward Smith and refusal to answer when Smith sought more information about the safety issue (Id., p. 3). In sum, Hollister explains that Mitchell violated company policy by knowingly failing to report an issue which he believed to be a safety issue, continuing to drive a truck which he believed was unsafe, and by failing to contact Driver after being dispatched and tell Driver that he would work (doc. 119-20).

II. <u>Standard of review</u>

When the Court receives cross-motions for summary judgment, it "must methodically take each motion in turn and construe all the facts in favor of the non-movant for each. If, after engaging in this analysis, the district court determines no genuine issue of material fact exists, then it may appropriately enter summary judgment for a party." <u>Thai Meditation Association of Ala., Inc. v. City of Mobile</u>, 83 F. 4th 922, 926 (11th Cir. 2023).

The Court of Appeals for the Eleventh Circuit has explained that

"[T]he moving party has the burden of demonstrating that there are no genuine issues of material fact ...." <u>Paylor v. Hartford Fire Ins</u>., 748 F.3d 1117, 1121 (11th Cir. 2014). In determining whether the movant has met this burden, we must view the evidence in the light most favorable to the non-moving party. <u>See Alvarez v. Royal Atl. Devs., Inc</u>., 610 F.3d 1253, 1263–64 (11th Cir. 2010). We also must draw all reasonable inferences in the non-movant's favor. <u>United States v. Four Parcels of Real Prop</u>., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc); <u>FindWhat Inv'r Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1307 (11th Cir. 2011). However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. <u>See Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005).

The nature of a summary judgment movant's burden varies depending on which party would bear the burden of proof on a disputed issue at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). Where a defendant moves for summary judgment on an issue for which it would not bear the burden of proof at trial, it is not necessary for the defendant to entirely negate the plaintiff's claim. <u>Id</u>. at 1115–16; <u>see also Celotex Corp v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." (emphasis in original)). Instead, the movant "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." <u>McGee v. Sentinel Offender Servs., LLC,</u> 719 F.3d 1236, 1242 (11th Cir. 2013).

Once a summary judgment movant's initial burden is met, "the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." <u>Paylor</u>, 748 F.3d at 1121. "Overcoming that burden requires more

than speculation or a mere scintilla of evidence." <u>Id</u>. at 1122. The non-movant must "go beyond the pleadings," to provide evidence and "designate specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation marks omitted). The non-movant will survive summary judgment in this instance if it can demonstrate "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." <u>Doe v. Drummond Co</u>., 782 F.3d 576, 604 (11th Cir. 2015) (internal quotation marks omitted).

<u>Poer v. Jefferson Cnty. Comm'n</u>, 100 F. 4th 1325, 1335–36 (11th Cir. 2024).

III. <u>Analysis</u>

A. <u>Mitchell's motion for summary judgment</u>[22]

In his motion, Mitchell cites Rule 56 of the Federal Rules of Procedure and case law explaining the standard of review for a motion for summary judgment.  Mitchell also cites the STAA (doc. 112 p. 3-4).  Mitchell does not mention Title VII or cite to any case law involving Title VII decisions. Thus, the Court construes his motion as a motion for summary judgment as to his claim under the STAA.

In Mitchell's Amended Complaint he claims that Perdido terminated him on May 13, 2023, for "reporting a safety issue" (doc. 31, p. 4, Amended Complaint).  His whistleblower retaliation

---

[22] Mitchell revisits two discovery disputes in his motion for summary judgment. He has consistently taken issue with the fact that attorneys assisted in the preparation of the declarations for Perdido's employees to sign. He appears to want the employees to write their own statements without assistance of counsel. Mitchell writes "… the plaintiff has not been allowed to review any of the witness' statements" and "The defendants have only provided legal narratives as statements from their attorneys."  He has been told multiple times that there is no issue with counsel assisting the employees in writing the declarations. Mitchell had previously requested that Perdido prepare and give him a written statement for every witness it intends to call at trial.  Perdido objected on grounds that it had no obligation to prepare these statements for Mitchell and that if he wanted to know a witness's statement, he could depose them.  The latter is mostly moot now because Perdido provided employee declarations in support of its motion for summary judgment. But in any event, Mitchell's discovery complaint is irrelevant to the issues before the Court.

claim is brought pursuant to 49 U.S.C. § 31105(a)(1)(A) of the Surface Transportation Assistance Act.[23] Relevant here, the STAA provides that "a person may not discharge an employee" because

> (A)(i) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding; or
>
> (ii) the person perceives that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order[.]

49 U.S.C. § 31105(a)(1).

Under subparagraph (A), "a 'violation' includes 'an act reasonably perceived to be a violation.'" Fort v. U.S. Dep't of Labor, No. 20-13998, 2023 WL 155210, at *3 (11th Cir. Jan. 11, 2023), *cert. denied sub nom.* Fort v. Dep't of Labor, 144 S. Ct. 140, 217 L. Ed. 2d 47 (2023) (quoting Koch Foods v. Sec'y, U.S. Dep't of Labor, 712 F.3d 476, 482 (11th Cir. 2013)).

To make a prima facie case, Mitchell must show that (1) he engaged in activity protected under the Act; (2) he suffered an adverse employment action; "and (3) a causal connection exists between the protected activity and adverse action." Fort, 2023 WL 155210, at *3 (citations omitted).

---

[23] Mitchell did not claim that Perdido terminated him for refusing to drive Truck 446. While the Court may give a liberal construction to a pro se pleading, it cannot rewrite Mitchell's Amended Complaint. Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007). Williams, Scott & Assocs. LLC v. United States, 838 Fed. Appx. 501, 501 (11th Cir. 2021) ("this leniency does not give [us] license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.") (quoting Campbell v. Air Jamaica Ltd., 760 F.3d 1165, 1168–69 (11th Cir. 2014)); Gilmore v. Hodges, 783 F. 3d 266 (11th Cir. 2013) ("The law is clear that pro se pleadings are held to a less demanding standard than counsel pleadings and should be liberally construed. But liberal construction is not the same thing as wholesale redrafting.") (internal citations omitted). And he cannot amend his Amended Complaint by way of his motion for summary judgment or his response to Perdido's motion for summary judgment. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

To establish protected activity under § 31105(a)(1)(A), Mitchell must show that he reasonably believed that Perdido had violated a safety regulation, and his belief must be "both subjectively and objectively reasonable." (Id.). "[T]o establish the causal connection," Mitchell "must show by a preponderance of the evidence that the protected activity was a contributing factor to the adverse action alleged in the complaint." Brown v. B&D Land Clearing & Logging, LLC, No. 3:17-CV-01413, 2020 WL 13248680, at *2 (D. Conn. Mar. 3, 2020).

Mitchell states he complained regarding the safety issues with Truck 446 on February 13, 2023, but Perdido continued to dispatch him to drive the alleged unsafe truck (doc. 112, p. 3-4). Mitchell also alleges that he complained about the safety of Truck 446 on May 10, 2023, and then was terminated on May 13, 2023.

In support of his allegation that there were safety issues reported, Mitchell points to Perdido's 2024 response to his OSHA complaint, his recordings, photos which allegedly show multiple problems with Perdido's trucks, "text messages to Driver about trucks being shut down or concerned about safety", photos and text messages regarding repairs to the trailer assigned to Truck 446 in April 2023, and the termination letter (doc. 112, exhibits). Mitchell also provides his affidavit[24] wherein he writes that Perdido "only provided trucks that had mechanical issues" but were "quick to address the issues" he brought forth, and as a result he "became a frequent visitor at various repair shops" (doc. 112-1). He also chronicles the events leading to his decision to meet

_____

[24] Perdido argues that any facts alleged in the motion and affidavit should be disregarded because they are unsworn and cannot be considered as evidence. The motion does not contain a sworn statement. Mitchell's affidavit is notarized. The notary attested only that Mitchell signed the document. There is no sworn statement that the facts alleged therein are based on Mitchell's personal knowledge. Additionally, as Perdido points out, many of Mitchell's alleged facts are speculation, conclusions, or based on hearsay. Giving Mitchell the benefit of the doubt that he did not understand the difference between a notarization of his signature and making a sworn statement, the Court will consider only the allegations in the Affidavit that appear to be based on Mitchell's personal knowledge.

with Smith and Lyles on May 10, 2023, and decision to refuse to drive Truck 446 on May 11, 2023 (Id.).  Mitchell concludes that "there is nothing in the record to support work refusal or insubordination, but the owner does admit safety reasons" (doc. 112, p. 3).

Perdido disputes Mitchell's allegations of fact and points out that it addressed each of Mitchell's numerous complaints regarding the trucks, including Truck 446, and asserts that Mitchell's termination was not related to his complaints about safety (doc. 123, p. 3-19).

Perdido also argues that Mitchell did not engage in protected activity under the STAA, and even if he did, his alleged protected activity, complaining about a safety violation on May 10, 2023, was not a contributing factor to his termination (Id., p. 25-29).  Perdido argues that it would have made the same decision to terminate Mitchell, even if he had not refused to drive or complained about a safety issue (Id., p. 29-30).  Specifically, Perdido asserts that Mitchell's act of continuing to drive a truck that he thought was unsafe "while repeatedly certifying 'no defects' on his DVIRs" would alone have resulted in his termination (Id., p. 29).

A review of the evidence indicates that Mitchell's belief that Perdido violated a safety regulation was not objectively reasonable.  For the objective standard, Mitchell doesn't "have to prove an actual violation of a specific safety regulation" but must "show an objectively reasonable belief related to violations of safety regulations." Fort, 2023 W: 155210 at *3. "To determine whether the belief was objectively reasonable", the Court must "consider the information available to a reasonable person in the same circumstances with the same training and experience" as Mitchell. Id.

On February 13, 2023, Mitchell reported to Smith and Lyles that the parameters on Truck 446 had been changed. Mitchell was told that only the mechanics at Kenworth could change the

parameters on Truck 446 and on February 14, 2023, Kenworth confirmed that the parameters had

not been changed and that the truck was performing appropriately.[25] Mitchell's subjective belief

otherwise is not supported by any evidence.

Mitchell continued driving Truck 446, and on March 8, 2023, Mitchell reported "lags during

takeoff" (doc. 119-7, p. 68; doc. 119-6).  This was the last report to Perdido that Truck 446 was

sluggish.  At the inspection following this complaint, mechanics drove Truck 446 but could not

duplicate Mitchell's complaint and confirmed there were no power issues with the truck (doc. 119-

7, p. 68-70). The next day, Pat Driver and Lyles called Mitchell, and he reported the truck was

"pulling fine" (doc. 119-4, ¶ 19). On March 10, 2023, Pat Driver called Mitchell again and he

reported that the "truck is pulling fine even under a load." (Id.).

On March 13, 2023, Mitchell reported "coolant light also shut down warning" (doc. 119-7,

p. 71).  Truck 446 was repaired at roadside and driven back to the shop (doc. 119-7, p. 72).

Mitchell resumed driving Truck 446 on March 22, 2023. On March 30, 2023, Mitchell reported

"Drive axle sensor rear" and the rear differential temperature sensor was removed and replaced at

Kenworth (doc. 119-7, p. 81).  On April 28, 2023, he reported "AC", and the air conditioning

system was repaired on May 1, 2023, at Gulfport (doc. 119-7, p. 103; doc. 119-6).  Mitchell did not

report on his DVIRs or his trip inspections that he had experienced a safety issue with Truck 446

(doc. 119-7, p. 133-138; Id., p. 137-138, Form Message Reports for inspections on April 3-28,

2023, May 1-5, 2023, and May 8-9, 2023).

Mitchell testified that he complained again to Lyles and Smith at the May 10, 2023 meeting

that the mechanics had changed the parameters on Truck 446 and he was having issues with slow

---

[25]  On February 14, 2023, Perdido sent the truck for inspection. The Kenworth mechanics found that
the parameters had not been changed and "[t]est drove the unit to check for any performance issues
or difference from other unit. Truck ran good like other Perdido units." (doc. 119-7, p. 110).

takeoff speed and sluggishness (doc. 119-3, p. 50).  Smith told Mitchell to bring the truck in for inspection and repair (Id.).  When Mitchell was asked "did you at any point in that meeting tell [] Smith that that truck was unsafe to drive?", Mitchell answered "All I – look, I can't remember because I ain't got that meeting recording." (Id., p. 51).  He was asked again whether he indicated at that meeting that Truck 446 was unsafe under the Federal Motor Carrier Act (Id., p. 52). Mitchell answered "I don't – I – like I told you, . . .  I related to them that it was something wrong with the truck. I don't know what I told them. But I know they know that I reported to them that this truck was malfunctioning according to the federal safety" but "couldn't pinpoint" the safety regulation (Id.).

A reasonable driver with the same training and experience, would not continue to believe that the parameters on Truck 446 had been altered when inspections, test drives, and independent mechanics continued to report that Truck 446 performed as expected.  The February 14, 2023, inspection at Kenworth confirmed that the parameters had not been changed since Mitchell began driving Truck 446.  Mitchell recorded a conversation with the mechanic at Kenworth during which the mechanic told Mitchell, "I didn't see anything in there out of the normal" and "yeah, there hasn't been nobody that changed anything in the last six months" and "from what i can see ain't nobody hooked up to it" (doc. 119-16).  Also, the inspection by Gulf Coast Trucks that was made after Mitchell's March 8, 2023, report of "truck lags during takeoff", confirmed no power issues with Truck 446 (doc. 119-6).  Based on this evidence, Mitchell's belief that a safety violation had occurred was not objectively reasonable.[26]

---

[26]  Mitchell believes Spencer influenced the mechanics at Kenworth and other locations because of his complaint of race discrimination against Spencer. Mitchell has not provided sufficient evidence to support this speculation. See Cordoba, 419 F.3d at 1169 (inferences supported only by speculation will not defeat a summary judgment motion).

Viewing the evidence in the light most favorable to Perdido, the non-movant, and drawing all reasonable inferences in favor of Perdido, the Court finds that Mitchell failed to show by a preponderance of the evidence that he engaged in protected activity.  Mitchell cannot show that he reasonably believed that Perdido violated a safety regulation or acted in a manner that could reasonably be perceived as a safety violation. Fort, 2023 WL 155210, at *3. Since Mitchell has failed to establish that he engaged in a protected activity, he has failed to make a prima facie case of retaliation under the STAA. Accordingly, Mitchell's motion for summary judgment is denied.

B. Perdido's motion for summary judgment

1. Mitchell's claim of hostile work environment based on race discrimination

In his Amended Complaint, Mitchell alleges that Perdido "began to discriminate against Mitchell after a meeting on September 29, 2022. The workplace became hostile and unsafe. The employer eventually terminated Mitchell for reporting a safety issue on May 13, 2023." (doc. 31, p. 4). Mitchell did not mention hostile work environment in his EEOC charge. He charged that:

> In or around May 2022, I was hired as a Driver.  I was discriminated against because of my race. I am Black.
>
> In or around November 2022, I was subjected to offensive comments by a shop foreman. In or around January 2023 I reported my truck was being tampered with by a mechanic. I was discharged for insubordination on or about May 10, 2023.

(Doc. 1-1, p. 4).

Before Mitchell can bring a Title VII action, he must "fil[e] a timely charge of discrimination with the EEOC." Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). Under Title VII, a charge generally must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1). Mitchell filed his EEOC charge

on June 15, 2023.  Thus, his charge was timely as to any discriminatory conduct that occurred on or after December 17, 2022, 180 days preceding June 15, 2023.

Also, the Court of Appeals for the Eleventh Circuit has held that

"a plaintiff's judicial complaint is limited by the scope of the [Equal Employment Opportunity Commission ("EEOC")] investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory v. Ga. Dep't of Hum. Res., 355 F.3d 1277, 1280 (11th Cir. 2004) (quotations omitted). The proper inquiry is whether the plaintiff's "complaint was like or related to, or grew out of, the allegations contained in her EEOC charge." Id. We have allowed claims "if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint." Id. at 1279–80 (quotations omitted).

Oirya v. Mando Am. Corp., 2025 WL 1392207, at *3 (11th Cir. May 14, 2025).

In his EEOC charge, Mitchell alleged three discrete events occurring in November 2022, January 2023, and May 10, 2023.  Mitchell did not charge that he was subject to a hostile work environment or that the alleged discrimination, i.e., the hostile work environment, began in September 2022, as alleged in his Amended Complaint. Thus, the Court looks to whether the events alleged in the Amended Complaint are "like or related to, or grew out of, the allegations contained in [the] EEOC charge." Oirya, 2025 WL 1392207, at *3.  Or whether the claims "amplify, clarify, or more clearly focus the allegations in the EEOC complaint." Id.  However, "allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." Scott v. Shoe Show, Inc., 38 F. Supp. 3d 1343, 1356 (N.D. Ga. 2014) (alteration, citation, and internal marks omitted). The Court assumes, without deciding, that the hostile work environment claim is sufficiently related to Mitchell's claims before the EEOC.

"To establish a prima facie case of a racially discriminatory hostile work environment, [Mitchell] must satisfy these five elements: (1) [Mitchell] belongs to a protected group; (2) [Mitchell] was subjected to unwelcomed harassment; (3) the harassment was based on

[Mitchell's]race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of [his] employment and created a discriminatorily abusive working environment; and (5) the Defendants are responsible for such environment under a theory of either direct or vicarious liability." Street v. Talladega City Bd. of Educ., No. 1:22-CV-614-CLM, 2025 WL 2743709, at *14 (N.D. Ala. Sept. 16, 2025) (citing Miller v. Kenworth of Dothan. Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)).

Perdido argues it is entitled to summary judgment as to Mitchell's hostile work environment claim because Spencer's alleged racial comments were not sufficiently severe or pervasive (doc. 120, p. 21-22). "In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller, 277 F.3d at 1276.  "[I]t is 'repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment' and not simply some 'magic number' of racial or ethnic insults." Id. (quoting Shanoff v. Illinois Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001)). Mitchell has alleged one incident where he was offended by what he perceived to be racial insults from a co-employee. This is insufficient to establish a racially hostile work environment that was severe and pervasive.  Accordingly, summary judgment is granted to Perdido on this claim.

2) Mitchell's termination based on race claim

Perdido argues that Mitchell cannot establish that it discriminated against him on basis of race. To make out a *prima facie* case of racial discrimination, Mitchell must show (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to adverse employment action; and (4) Perdido treated similarly situated employees who were not black more favorably.

Lewis v. City of Union City, Georgia, 934 F.3d 1169, 1185 (11th Cir. 2019).  Mitchell has failed to point to any similarly situated employees (employees who failed to report for work and failed to report safety issues on the DVIRS and post inspection reports) who were not black that were treated more favorably (not terminated).   But, even without similarly situated comparators, Mitchell can "survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. at 1185 (citations omitted).  Mitchell has failed in this regard also.  There simply is no evidence from which a reasonable jury could find that Mitchell was fired because he is black.

Perdido argues that even if Mitchell could establish a prima facie case of race discrimination, it had legitimate non-discriminatory reasons for his termination, which Mitchell cannot show are pretextual.  Specifically, Perdido states that it terminated Mitchell because of his insubordination toward Smith, failure to report safety issues on his DVIRs or trip inspection reports or to his Driver Manager, falsely reporting that Truck 446 did not have a safety defect when he later stated that the truck was unsafe to drive, and failing to report for work after he was dispatched and failing to tell his Driver Manager that he was not reporting for work (Id.).

The evidence show that Mitchell failed to report for work after he was dispatched on May 9, 10 and 11, 2023 and that he did not notify his Driver Manager that he would not report for work (doc. 119-20).  Hollister considered this conduct a violation of company policy (Id.) Mitchell does not dispute this conduct.

At the May 10, 2023 meeting Mitchell told Lyles and Smith that Truck 446 had been sluggish for the past months, but he was living with it and had not reported the issue (doc. 119-4).  Hollister found it unacceptable that Mitchell continued to drive Truck 446 while believing the truck was unsafe due to a power issue and unacceptable that he did not report the issue on his DVIRs or

his trip inspection reports and did not tell his Driver Manager. Hollister considered this a falsification of logs a serious violation of company policy (doc. 119-20).  Mitchell does not dispute this conduct.

Hollister also explained that Mitchell was terminated for his "disrespect toward and refusal to answer" Smith when he "sought clarification about why the truck needed to be shut down all of the sudden" (doc. 119-20, p. 3).  All of these reasons for termination are legitimate non-discriminatory reasons.

Mitchell appears to argue that Hollister did not have firsthand knowledge of the events, but instead relied on information from Lyles and Smith, when he made "a judgment to wrongfully terminate" Mitchell "for safety issues involving racial issues" (doc. 124). However, the fact that Hollister relied on information from Lyles and Smith, does not establish that his decision to terminate Mitchell was a pretext for racial discrimination.  Mitchell just disagrees with Hollister's judgment, i.e., his decision to rely on information from Lyles and Smith. Mitchell cannot establish that Perdido's "proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer." Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).

"The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).  "[A]n employer's honest belief that an employee violated its policies can constitute a legitimate reason for termination even if the employer's belief may have been mistaken or wrong." Connelly v. WellStar Health Sys., Inc., 758 Fed. Appx. 825, 829 (11th Cir. 2019) (citing Smith v. PAPP Clinic, P.A., 808 F.2d 1449 (11th Cir. 1987)).  Mitchell has not presented any evidence from which a reasonable fact finder could

conclude that Perdido's reasons for terminating Mitchell were false and that race discrimination was the real reason. <u>Baker v. Russell Corp</u>., 372 Fed. Appx. 917, 920 (11th Cir. 2010)) ("[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.") (quoting <u>St. Mary's Honor Ctr. v. Hicks,</u> 509 U.S. 502, 515, (1993)) (quotation marks omitted)).

Viewing the evidence in the light most favorable to Mitchell, the non-movant, and drawing all reasonable inferences in his favor, Mitchell has failed to provide evidence from which a reasonable jury could find that Perdido's proffered reasons for termination were a pretext for race discrimination. Accordingly, summary judgment is granted in favor of Perdido as to Mitchell's claim of hostile work environment based on race.[27]

3. <u>Mitchell's claim of violation of the STAA</u>

Perdido argues that Mitchell cannot prevail on his claim that Perdido violated the STAA. Perdido argues that Mitchell was not terminated for complaining about safety issues with Truck 446, an alleged protected activity under the STAA, but instead Mitchell

> was terminated because he went to Perdido's office and told Smith and Lyles point blank that he had been driving a truck for a month with alleged problems he claimed made it unsafe to drive without notifying anyone on his DVIR (or otherwise) in clear violation of Perdido's safety rules, and then was insubordinate when Gary Smith sought clarification about the sudden change, and failed to show up for work when

---

[27] Perdido also argues that any claim of retaliation under Title VII is barred for failure to exhaust because Mitchell did not include this claim in his EEOC charge and his charge does not contain allegations from which a Title VII retaliation claim could reasonably grow (doc. 120, p. 19-20). <u>Although it does not appear that Mitchell is alleging retaliation under Title VII, the Court agrees.</u> Mitchell's EEOC charge states that Perdido "terminated" him "for reporting a safety issue." Neither the EEOC charge nor the Amended Complaint allege that Mitchell was terminated for reporting protected activity under Title VII (doc. 31, p. 4, EEOC Charge: "The employer eventually terminated Mitchell for reporting a safety issue on May 13, 2023"; doc. 1-1, p. 4, Amended Complaint: "I was discharged for insubordination on or about May 10, 2023"). The undisputed evidence shows that the "insubordination" was Mitchell's response to Smith's question "You need to tell me exactly what's unsafe about the truck" (doc. 119-19).

dispatched without ever contacting his Driver Manager. His alleged protected activity did not contribute to his termination.

(Doc. 120, p. 29).

As previously discussed, Mitchell cannot point to sufficient evidence from which a reasonable jury could find that his belief that a safety violation had occurred was objectively reasonable.  However even if Mitchell could show a genuine issue of material fact as to whether he engaged in a protected activity, and that his protected activity was a contributing factor to his termination, Perdido is entitled to summary judgment because it can show by clear and convincing evidence that it would have made the same decision to terminate Mitchell, even if he had not complained about safety issues.

As argued by Perdido, Mitchell's alleged safety complaint on May 10 and May 11, 2023, "did not give him latitude to refuse to comply with Perdido's work rules on reporting to his Driver Manager or showing respect for his fellow employees and Safety Manager." (doc. 120, p. 39).  The undisputed evidence shows that Mitchell violated Perdido's company policies. Mitchell continued to drive Truck 446 for approximately a month when he believed that the truck had a safety issue. Perdido's policies prohibit drivers from operating a truck with any defect that would affect safe operations and Perdido has terminated drivers for failing to report safety concerns (doc. 119-20). Hollister made clear in his declaration that if he knew an employee continued to drive a truck the employee believed unsafe, while simultaneously certifying on company records that there was no defect, as Mitchell did, he would make the same decision to terminate that employee as he did with Mitchell (Id.).  The undisputed evidence also shows that despite Mitchell being dispatched to drive on May 10, 11, and 12, 2023, he did not drive and did not contact his Driver Manager to inform him that he would not be driving.

Viewing the evidence in the light most favorable to Mitchell, the non-movant, and drawing all reasonable inferences in his favor, the Court finds that Perdido has shown through clear and convincing evidence that it would have taken the same action even if Mitchell had not reported a safety issue with the truck. <u>Jacobs v. U.S. Dep't of Lab.</u>, 806 Fed. Appx. 832, 834 (11th Cir. 2020) (a defendant "can avoid liability by showing, through clear and convincing evidence, that it would have taken the same action in absence of the alleged protected activity."). Accordingly, summary judgment is granted in favor of Perdido as to Mitchell's claim under the STAA.

IV. <u>Conclusion</u>

For the reasons set forth herein, Mitchell's motion for summary judgment is denied and Perdido's motion for summary judgment is granted.

Final judgment in favor of Perdido shall be entered by separate document as required by Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this 18th day of November 2025.

<u>s / Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**